NEW YORK & WILMINGTON STEAMSHIP CO. v. McLAUGHLIN.

(Circuit Court of Appeals, Third Circuit. May 14, 1895.)

No. 3.

NEGLIGENCE—DEFECTIVE MACHINERY.

Libelant, a fireman on a steamer, while engaged in hoisting ashes with a steam hoisting apparatus, was injured by the bucket on the hoisting rope running too far up, and cutting off his finger. It appeared that the apparatus was simple, and could have been so adjusted as to be perfectly safe, but that it had not been so adjusted. It also appeared that the defect had existed for some time, and that the attention of the officers of the vessel had been called to it. *Held*, that the vessel was liable for the injury sustained by libelant.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

This was a libel for personal injuries by John McLaughlin against the steamer Benefactor (the New York & Wilmington Steamship Company, claimant). The district court entered a decree for the libelant, upon the following opinion (BUTLER, District Judge):

The libelant, who was a seaman on board the respondent, sues to recover compensation for an injury sustained while operating her ash hoist on a trip from Philadelphia to Richmond. I find the facts to be substantially as

set out in his statement: "This hoist consisted of a tube or brass cylinder containing a piston, to which was attached a wire rope which passed through a gland or stuffing box over a pulley. A lever operating a valve admitted steam on top of the piston, driving the piston down, causing the bucket, which was attached to a rope or fall, to ascend through the ventilator to a door in it on deck, through which the bucket of ashes was taken by the operator and his assistant, and dumped overboard. At the discharge of the ventilator was a house containing a door 2½ feet wide, and a window which at that time was inclosed with a sash and glass. Inside the house was a lever, and there was only enough room to enable the operator to stand in the doorway and work the lever, take the bucket of ashes from the hook, and pass it outside to another fireman, who assisted in dumping it. On the voyage in question the firemen noticed that a three-inch stud bolt which was used to secure the gland or stuffing box of the hoist, to prevent the escape of steam, was broken off; and a piece of wire was wrapped around it, as a makeshift to take its place. The officers of the steamer knew of this, and admitted that it was the third voyage which the steamer had made from Philadelphia with the broken bolt, but that they did not have time to repair it. The effect of this absence of the bolt was to permit the steam to escape from the cylinder, and render the hoist dangerous to work. Every fireman on board during the voyage complained to all of the officers that the hoist was out of order. At times the bucket would not come up far enough in the ventilator for the operator to take hold of it, and would slide back again to the fire room. The only thing done by the officers, or those in charge of the machinery, was to tie knots in the rope which held the bucket. Some four or five knots were thus made in the rope, which, instead of making any improvement, rendered the working of the hoist more irregular. Instead of the bottom of the bucket stopping two inches above the sill of the ventilator door, as intended by the inventor, the bucket would go up into the ventilator, until the handle struck the hook on the top of the pulley. Two of the firemen refused to operate it. Those in charge of the machinery, seeing the danger, then suggested to libelant to let the bucket go up as far as it would go, and take it out when descending. This seemed the safest way to operate the hoist, and libelant adopted it. On the 27th of March the steamer was in Norfolk, and it is alleged by her officers that the broken bolt was replaced there on that day. Although this may have been done (which is denied by libelant), the rope which held the bucket, and had been knotted and shortened and adjusted to compensate for the loss of steam, was permitted by the officers to remain in that condition. The steamer left Norfolk at night on the 27th of March, and, about 11 o'clock the same night, libelant started, during his watch, to raise ashes at the hoist. It worked worse than ever. The bucket would go up, and strike with greater force than before, and come down again. The third bucket had gone up in this way, and when it was coming down, and libelant had put his hand on to take it out, the lever, which was loose, and had been affected by the unusual jarring caused by the bucket's striking above, and the lurching of the vessel, fell over, sending the bucket up again, and taking libelant's finger with it, and cutting off part of it. A new fall or rope, to take the place of the knotted one, was afterwards rigged up, the next morning. The method of operating the hoist was also afterwards changed. The sash was taken out of the window, and the man who operated the lever stood outside the window, and was compelled to hold on to the lever until his assistant landed the bucket."

I need not discuss the evidence. It sustains the foregoing statement in all essential respects. The theories of respondent's witnesses respecting the cause of the accident, and the manner in which it occurred, are entitled to very little weight, as against the direct and positive testimony on the other side. That the hoist was out of order, and was dangerous to one operating it, and that the libelant was injured while engaged in the discharge of this duty, is entirely clear. I find no reliable evidence that he was negligent. The presumption is that he was not, and more especially in view of the fact that he knew the hoist to be out of repair, and difficult to work with safety. While there is no evidence to repel this presumption, his testimony supports it. He could not properly refuse the work, and would have en-

countered the risk of punishment if he had. The notion that his injury resulted from the slamming of a door is met, not only by positive testimony to the contrary, but also by evidence that this was impossible. The charge that the libelant was neglected,—that he did not receive proper treatment,—after the accident, is not sustained. The case must go to a commissioner to ascertain the extent of the injury, and the compensation due.

Claimant appeals.

J. W. Bayard and Frank P. Prichard, for appellant.

John A. Toomey, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and BUFFINGTON, District Judge.

BUFFINGTON, District Judge. This is an appeal by the New York & Wilmington Steamship Company from a decree entered against it by the district court of the Eastern district of Pennsylvania in a libel filed by John McLaughlin for personal injuries. The proofs show that on March 27, 1893, libelant, while performing his duties as a fireman on the Benefactor, one of appellant's vessels, in raising ashes, by means of a patent steam hoist, from the fire room to the deck, had the middle finger of his right hand cut off at the first joint. He alleged the machinery and appliances were not proper for the purpose; were, to the knowledge of the officers, out of order; and that his wound was improperly treated on the vessel. The last issue was found for the ship, the other for the libelant, a decree entered in his favor, and from it the present appeal is taken. After full examination of the proofs, we are of opinion there was no error in the result reached by the court below.

The testimony of Mr. Selden, the inventor of the apparatus, and of other witnesses called by the respondent, shows the hoist was simple in design and construction, and capable of such an adjustment as allowed it to be safely worked by unskilled men. A description of it is as follows: Near the ventilating shaft through which the ash bucket was to be hoisted, a piston was placed in a tube having a length equal to the hoist, or made equivalent thereto by means of pulleys. Secured to the piston was a wire rope passing through the stuffing box and over a pulley, whence, by a rope running down the shaft, connection was made with the ash bucket. A valve controlled by a lever near a door opening from the ventilator to the deck admitted steam to the top of the piston. By this means the piston was driven to the bottom of the valve, and the bucket raised to clear the ventilator door. Mr. Selden describes it as being operated by a single person and says:

"A man standing there, looking down in the tube, could see the bucket five feet down, before it reached the hole. He stands with his hand on the lever, and, as the bucket comes up, the intention is to shut off the steam, and take the bucket out. The lever is placed very conveniently to him."

He says that, after the steam is shut off by the lever, it is impossible for the bucket to rise any higher; or, to use his words, "it is nothing in the world but a lever with a weight on one side and a weight on the other." He says the apparatus is adusted so that the bucket clears the bottom of the door by two or three inches, and

that the arrangement of this vessel was such that, if all the steam was turned on until the piston was all the way down, it would hold the bucket at rest at that point. The captain of the vessel, O'Neil, speaks thus of the working of the hoist:

"Q. When he turns the steam on, what happens? A. The bucket comes up. When it gets to a certain height, it stops itself. You could not pull the bucket out then, or haul it out, because the steam is still on the piston, and the piston is down at the bottom of the cylinder. You have got to reverse the lever, and then you shut the steam valve and open the exhaust. That relieves the pressure off the piston, and you can haul the bucket out."

The testimony of Wood, the assistant engineer, is:

"Q. Why is it that this bucket cannot rise higher than you have described? [Two inches from the lower edge of the ventilator door.] A. Because the piston goes down in the bottom of the cylinder, and you can't get it any further. Q. You mean, when the ash bucket is that high, the piston is down at the bottom of the cylinder? A. Yes. sir; down to the bottom of the cylinder."

From this testimony, it is quite clear how the hoist should work when properly adjusted, and that it could be so adjusted that, even when run by an unskilled man, it was impossible to force it as high as the upper edge of the ventilator door. But, unfortunately for the appellant, the overwhelming testimony of the libelant and his witnesses shows the bucket did strike the upper edge of the door, and the explicit admission of the answer concedes that it was at that place libelant's finger was cut off. The second paragraph of the libel says the injury was caused by libelant's finger "being caught between the edge of the iron bucket containing the ashes, and the top of the ventilator door, through which the bucket was taken to be emptied;" and the answer says, "the averment in the second paragraph of the libel as to the manner in which libelant was injured is true." The appellant afterwards took the position that it was a physical impossibility that such a thing should happen; but even if this issue were still open, in view of the express allegation in the libel, and the equally explicit admission of its truth in the answer, we are of opinion the proofs show that this was the manner and the cause of libelant's injury. The testimony of Welsh and libelant, who were the only persons present, is positive that Mc Laughlin's finger was caught between the bucket and the upper edge of the door, and the testimony of the numerous persons who had worked the hoist is quite convincing that the bucket did run up as high at other times. In view of these facts, and of the fact that the appliance could have been so adjusted as to have avoided any such danger, we think no injustice is done in visiting the appellants with the damage which resulted from their failure to so adjust the hoist as to avoid this danger. The decree will therefore be affirmed.